# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KEVIN WOODELL GODWIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16CV1217 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Kevin Woodell Godwin brought this action to obtain review of a final decision of the Commissioner of Social Security[1] denying his claim for supplemental security income. The Court has before it the certified administrative record and cross-motions for judgment.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for supplemental security income, alleging a disability onset date of January 1, 2007. (Tr. 203-208.) The applications were denied initially and upon reconsideration. (*Id.* at 97-100, 104-13.) After a hearing, an Administrative Law Judge ("ALJ") determined on February 20, 2015 that Plaintiff was not disabled under the Act. (*Id.* at 31-62, 12-26.) The Appeals Council denied a request for review, making the ALJ's decision the final decision for purposes of review. (*Id.* at 1-5.)

---

[1] Nancy Berryhill recently became the Acting Commissioner of Social Security and should be substituted as Defendant in this suit. *See* F.R.C.P. 25(d). Transcript citations refer to the administrative record filed manually with the Commissioner's answer. (Docket Entry 8.)

## II. STANDARD FOR REVIEW

The scope of judicial review of the Commissioner's final decision is specific and narrow. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Review is limited to determining if there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The issue before the Court is not whether Plaintiff is disabled but whether the finding that he is not disabled is supported by substantial evidence and based upon a correct application of the relevant law. *Id.*

## III. THE ALJ'S DECISION

The ALJ followed the well-established sequential analysis to ascertain whether the claimant is disabled, which is set forth in 20 C.F.R. § 416.920. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). The ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since the application date of October 4, 2012.[2] (*Id.* at 14.) The ALJ next determined at step two that Plaintiff had the following severe impairments: borderline intellectual functioning; mood disorder; history of Sotos syndrome;[3]

---

[2] Prior to step one, the ALJ noted that Plaintiff had filed an application for supplemental security income in 1991, that it was granted, and that Plaintiff received supplemental security income until 1999, when it was then terminated for unspecified reasons. (Tr. 12.)

[3] Sotos Syndrome is a disorder characterized by a distinctive facial appearance, overgrowth in

2

history of renal stones; and subjective complaints of back pain with no objective findings on x-ray. (*Id.* at 15.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1. (*Id.*) The ALJ next set forth Plaintiff's Residual Functional Capacity ("RFC") and determined that he could perform light work and that he was limited further to the performance of the

> occasional climbing [of] ropes, ladders, and scaffolds; occasional bending, balancing, crouching, stooping, kneeling and crawling; with simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work-[p]lace changes; no work at a fixed production rate or pace; occasional contact with supervisors, co-workers and the public; no requirements to read instructions or write reports or perform math calculations above third grade level; and must be reminded of task one time per day.

(*Id.* at 18.)

At step four, the ALJ determined that Plaintiff could not perform any past relevant work. (*Id.* at 24.) At step five, the ALJ determined that there were other jobs in the national economy that Plaintiff could perform. (*Id.* at 25.) Consequently, Plaintiff was found not to be disabled under the Act. (*Id.*)

## IV. ISSUES AND ANALYSIS

Plaintiff's only argument is that "[t]he ALJ committed reversible error in failing to find that [his] severe impairments . . . meet the criteria of Listing 12.05C." (Docket Entry 11 at

---

childhood, and learning disabilities or delayed development of mental and movement abilities. *See* https://ghr.nlm.nih.gov/condition/sotos-syndrome. "People with Sotos syndrome often have intellectual disability, and most also have behavioral problems." *Id.*

9.) For the following reasons, the Court concludes that the ALJ's decision is not susceptible

to judicial review and that, as a result, a remand is proper.

## V. ANALYSIS

### I. The ALJ's 12.05C Analysis Is Not Susceptible to Judicial Review.

Listing 12.05C is described, and its applicable criteria are set forth, as follows:

> 12.05 Intellectual disability: Intellectual disability refers to
> significantly subaverage general intellectual functioning with
> deficits in adaptive functioning initially manifested during the
> developmental period; i.e., the evidence demonstrates or
> supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the
> requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60
> through 70 and a physical or other mental impairment
> imposing an additional and significant work-related
> limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.[4]

Where, as here, the paragraph C severity criteria are at issue, the Fourth Circuit has

described the first showing—deficits in adaptive functioning initially manifested during the

developmental period—as "Prong 1." *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012).

---

[4] The 12.05 listing criteria were amended effective January 17, 2017, along with all of the other mental health listings. *See Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138–01, 2016 WL 5341732 (September 26, 2016). However, the Court applies the regulations in this decision as these were the regulations in effect at the time of the ALJ's decision. *Id.* n1. ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions. If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in the decision we make after the court's remand.").

The Prong 1 diagnostic criteria for an intellectual disability includes two components—deficits in adaptive functioning *and* an onset before age 22—that must both be satisfied in order for the listing to apply. *Id.* at 475 (commenting that an ALJ's finding that neither component was satisfied would be upheld if "[e]ither finding alone" was supported by substantial evidence). The Fourth Circuit has also described the conjunctive paragraph C requirements—a valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function—as "Prong 2" and "Prong 3." *Id.* at 473.

Here, in his decision, the ALJ evaluated this listing and concluded as follows:

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation or function. On February 7, 2013, examiner Anthony J. Smith, Ph.D., administered a Wechsler Adult Intelligence Scale-IV and determined that the claimant had a Verbal IQ score of 61, Performance IQ score of 67 and a Full Scale IQ score of 61. Dr. Smith concluded that the claimant's academic skills were in the very low range and diagnosed him with a mood disorder due to Soto's syndrome, with depressive features; borderline intellectual functioning; and Soto Syndrome. Dr. Smith noted that the claimant had difficulty comprehending verbal and written material. He opined that the claimant's several physical problems could interfere with his daily functioning and could limit his ability to perform simple, routine, and repetitive tasks and maintain concentration persistence and pace (Exhibit 4F). On February 22, 2013, Earnest B. Eason, M.D., performed a consultative examin[ation] on the claimant and noted that the claimant worked as a carpenter; a trade that he learned from his parents. Dr. Eason noted that patients with Soto's syndrome often have mild mental retardation, delayed motor, cognitive and social development and low muscle tone. He added that the disease has a tendency to get better with age

5

and that adults with this syndrome have a normal life span and normal intellectual function, though coordination problems may persist. Dr. Eason opined that the claimant had persistent learning disorder and probably some poor social skills, but he did not think he was mentally retarded. Dr. Eason added that the claimant just passed on in school, but his desire for function seemed to be limited and he seemed to lack desire (Exhibit 6F).

Although Dr. Smith found that the claimant has a Full Scale IQ score of 61, the evidence does not show that he has a physical or other mental impairment imposing an additional and significant work-related limitation of function. Dr. Eason concluded that the claimant's Soto syndrome did not render him mentally retarded, but instead he lacked desire. Dr. Eason added that the physical manifestations of this syndrome, clubbing of the fingers and a slight enlargement of the forehead, were not problems for the claimant. Dr. Eason's opinion is afforded significant weight as it is consistent with the record as a whole. Dr. Eason noted that the claimant learned carpentry from his parents and worked as a carpenter for six years. Certainly, this occupation requires a level of skill and coordination that the claimant was able to achieve. Further, the vocational expert testified that the claimant worked as an electrician['s] helper at the semi-skilled level. The claimant testified that he takes public transportation and does his food shopping. The claimant further alleges that his back pain is disabling. He made several trips to the emergency department with complaints of back pain. Although the record contains no significant finds pertaining to his back, the undersigned notes the claimant's ability to clearly articulate his complaints and seek treatment for his complaint. For example, on April 13, 2012, Beth Carter, RN, noted that the claimant verbalized understanding and ability to comply with instructions. Again, on June 24, 2010, it was noted that the claimant has acknowledged understanding and agreed with the plan of care, and there were no barriers to understanding. On August 7, 2009, not only did the claimant have normal gait and no swelling, tenderness or decrease of range of motion to his back, it was noted that he was oriented times 3, had a normal affect and responded appropriately to questions (Exhibit 1F). On August 23, 2013, the claimant was noted to be alert and oriented; he had normal strength and normal range of motion of the musculoskeletal system (Exhibit 10F). Based on the above,

the undersigned finds that the claimant did not satisfy the criteria of listing 12.05. Dr. Smith's assessment was based on a one-time visit and did not appear to consider the claimant's work history or his ability to function on a day-to-day basis. Consequently, limited weight is given to this assessment. The claimant has consistently displayed the ability to clearly articulate his medical needs and secure an abundance of pain medications. He cares for his daily needs and assists with the care of his disabled mother. His physical and other mental complaints do not impose additional and significant work-related limitations of function.

(Tr. 16-17.) For the following reasons, the Court concludes that the ALJ failed to build a logical bridge between the evidence and her findings of fact and conclusions of law and that, as a result, her decision is not susceptible to judicial review.

## A. The ALJ's Prong 1 Analysis Is Not Susceptible to Review.

While Prong 1 of Listing 12.05C "does not expressly define 'deficits in adaptive functioning' . . . '[a]daptive activities' are described elsewhere in the [Mental Disorders] Listing . . . as 'cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.'" *Hawley v. Astrue*, No. 1:09CV246, 2012 WL 1268475, at *5 (M.D.N.C. Apr. 16, 2012) (unpublished) (citing *Blancas v. Astrue*, 690 F. Supp. 2d 464, 476 (W.D. Tex. 2010) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05 and 12.00(C)(1)); *accord Hager v. Astrue*, No. 2:09CV1357, 2011 WL 1299509, at *2 (S.D.W.Va. Mar. 31, 2011) (unpublished).[5]

---

[5] Though Listing 12.05 does not specifically define "adaptive functioning," SSA regulations provide that "[t]he definition of [an intellectual disability] . . . in [the] listings is consistent with, if not identical to, the definitions of [intellectual disability] used by the leading professional organizations."

Beyond this, in *Hancock v. Astrue*, the Fourth Circuit Court of Appeals provided a valuable standard of comparison for assessing an ALJ's findings regarding Prong 1's adaptive functioning requirement. In *Hancock*, the Fourth Circuit addressed for the first time whether an ALJ may reject an IQ score that is the only score in the record. 667 F.3d at 474. The claimant had been assigned a full scale IQ of 63 by the consultative examiner. *Id.* at 473. In his report, the examining psychologist did not attest to the validity of the scores or opine that the claimant gave her best effort. *Id.* The court reasoned that "[i]t is not at all clear whether an examiner's failure to attest to the validity of IQ scores *alone* would be sufficient to support an ALJ's decision to discredit the only IQ scores in the record." *Id.* at 475. Nevertheless, the court concluded that there was sufficient support for the ALJ to reject the sole IQ score on the record because it was inconsistent with the evidence in the record of the claimant's actual functioning and the conclusions of treating psychiatrists. *Id.* at 475.

*Hancock* is also particularly relevant to a Prong 1 analysis because the Fourth Circuit upheld the ALJ's finding that the claimant failed to carry the burden of showing deficits in adaptive functioning where the claimant had: (1) "the ability to shop, pay bills, and make change," (2) "takes care of three small grandchildren at a level of care that satisfies the Department of Social Services," (3) "does the majority of her household's chores, including cooking and baking," (4) "is attending school to obtain a GED," and (5) "does puzzles for

---

Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, at 20,022 (Apr. 24, 2002). Because "the SSA declined to adopt any one of [these] specific definitions . . . the introductory paragraph of Listing 12.05 can be met if the individual is found to have, inter alia, deficits in adaptive functioning as defined by any of the four professional organizations." *Durden v. Astrue*, 586 F. Supp. 2d 828, 834 (S.D. Tex. 2008).

entertainment." *Id.* at 476.[6] Additional case law shows that the issue of whether a claimant manifested deficits in adaptive functioning during the developmental period is a fact-specific inquiry with few bright-line rules. *See, e.g., Salmons v. Astrue*, No. 5:10CV195-RLV, 2012 WL 1884485, at *5 (W.D.N.C. May 23, 2012) (unpublished) (collecting cases).

Additional case law suggests that literacy is also an important factor. *See Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 668-69 (4th Cir. 1989); *Salmons*, 2012 WL 1884485, at *7; *Holtsclaw v. Astrue*, No. 1:10CV199, 2011 WL 6935499, at *4 (W.D.N.C. Dec. 30, 2011) (unpublished); *Rivers v. Astrue*, No. 8:10-cv-314-RMG, 2011 WL 2581447, *4 (D.S.C. June 28, 2011) (unpublished). Similarly, whether the claimant has lived independently is relevant. *Compare Salmons*, 2012 WL 1884485, at *7 *with Holtsclaw*, 2011 WL 6935499, at *5.

Another guiding factor is whether the claimant has ever provided care for others, or whether the claimant is dependent on others for care. *Compare Salmons*, 2012 WL 1884485, at *7 (noting claimant was heavily dependent on his mother and was not responsible for the care or supervision of others) and *Holtsclaw*, 2011 WL 6935499, at *4-5 (noting claimant had never lived independently and required a parent's help) *with Hancock*, 667 F.3d at 475-76 (affirming denial of benefits where the claimant managed the household and cared for her three young grandchildren) and *Caldwell v. Astrue*, No. 1:09cv233, 2011 WL 4945959, at *3 (W.D.N.C. Oct. 18, 2011) (unpublished) (claimant assisted in the care of elderly parent). School records and

---

[6] Although the Fourth Circuit found these characteristics sufficient to support a finding of an absence of deficits in adaptive functioning, the Fourth Circuit did not intimate that those (or comparable) capabilities constituted the minimum necessary to uphold such a determination. *See Hancock*, 667 F.3d at 476 & n. 3.

past academic performance are also important indicators of deficits in adaptive functioning prior to age 22. *See Salmons*, 2012 WL 1884485, at *7; *Rivers*, 2011 WL 2581447, at *3 (noting claimant classified as special needs at school, had repeated evaluations in elementary school with IQ scores all in the 50s, and dropped out of school in the ninth grade); *see also Conyers v. Astrue*, No. 4:11-CV-00037-D, 2012 WL 3282329, at *8 (June 29, 2012) (unpublished), *adopted in* 2012 WL 3283285 (E.D.N.C. Aug. 10, 2012) (unpublished) (discussing the claimant's school history).[7]

Additionally, work history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, *Luckey*, 890 F.2d at 669, can be relevant in determining whether a claimant manifested deficits in adaptive functioning prior to age 22. *Hancock*, 667 F.3d at 475-76 (concluding ALJ's finding that the claimant did not manifest requisite deficits in adaptive functioning to be supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked several jobs); *Harts v. Astrue*, 2012 WL 529982, at *6 n. 3 (D.S.C. Jan. 30, 2012) (unpublished) (distinguishing *Luckey* because the ALJ used the claimant's work history as only one factor to support his finding of no significant deficits in adaptive functioning and because the claimant in *Harts* did not otherwise meet the Listing 12.05C criterion of a valid IQ score within the range of 60-70), *adopted and incorporated in* 2012 WL 529980 (D.S.C. Feb.17, 2012) (unpublished). Finally, the tasks a claimant is able to undertake, although not determinative, have been considered in this analysis. *See generally*

---

[7] Although *Conyers* was addressing Listing 12.05B, the adaptive functioning analysis in that case is instructive even when the issue is whether the Listing 12.05C criteria are met.

*Radford v. Astrue*, No. 5:08-CV-421-FL, 2009 WL 1675958, at *6 (E.D.N.C. June 10, 2009) (unpublished) (finding that the claimant's ability to perform certain tasks was not inconsistent with a mild intellectual disability); *see, e.g., Hancock*, 667 F.3d at 476 & n. 3 (affirming ALJ's consideration of the claimant's ability to perform tasks such as shopping, paying bills, and making change); *Salmons*, 2012 WL 1884485, at *7 (discussing claimant's inability to do household chores, cook, and drive).

Here, nowhere in the excerpt above or in her decision does the ALJ mention the first prong of a 12.05C analysis, deficits in adaptive functioning prior to the age of 22. Moreover, nowhere does the ALJ meaningfully[8] address the details of Plaintiff's educational background, which, as explained, is an important factor in a Prong 1 analysis. *See Salmons*, 2012 WL 1884485, at *7 ("[F]unctional academic skills is the primary measure of deficits of adaptive functioning before age 22.") The record shows that Plaintiff repeated kindergarten (Tr. 272); that he was in "EMH" classes in elementary school (*id.* at 273-74);[9] his progress in junior high and senior high was not marked by the typical notation of "promoted" when moving through the grades but rather was noted by either "placed" or "withdrawn," and, again, typically in EMH courses (*id.* at 276). Dr. Eason believed that Plaintiff "was just passed on in school given his history of not educated [sic]." (*Id.* 514.) Plaintiff's standardized achievement scores

---

[8] In support of her RFC finding later in the decision, the ALJ mentions Plaintiff's specific educational background only insofar as she states that he "has an 11th grade 'limited' education in special education classes from 1988 to 1990." (Tr. 18.)

[9] EMH is shorthand for "educably mentally handicapped." *See Scott v. Colvin*, No. 1:13CV63 ACL, 2014 WL 4659481, at *8 (E.D. Mo. Sept. 17, 2014) (unpublished).

were also quite low, between the bottom first and eighth percentiles nationwide. (*Id.* at 278; 279.) It is unclear from the ALJ's decision that she meaningfully evaluated this evidence or reconciled it with any conflicting evidence, given the scant references in her decision regarding Plaintiff's past education and how it might relate to deficits in adaptive functioning. Consequently, the Court concludes that the ALJ's decision on this issue is not susceptible to judicial review. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (noting that ALJ is required to draw "an accurate and logical bridge from the evidence to [the] conclusion").

Additionally, while the ALJ in this case does discuss Plaintiff's prior work history— which is a relevant factor in assessing the Prong 1 criteria—she never makes it clear that she is doing so in relation to Plaintiff's adaptive functioning. *See Hancock*, 667 F.3d at 475-76. And, to complicate matters further, the ALJ makes at least two erroneous factual findings that are not supported by substantial evidence. First, the ALJ erroneously credits Plaintiff with working in a *semi-skilled* job as an electrician's helper (Tr. 17), when the vocational expert that testified at the evidentiary hearing described that work as unskilled (*id.* at 57). This error is potentially material, because the level of skill a 12.05C claimant has performed in the past is relevant to a Prong 1 adaptive functioning inquiry. *See, e.g., Hines v. Astrue*, 317 Fed. Appx. 576, 579 (8th Cir. 2009) (approving the ALJ's characterization of the claimant's prior work in a semi-skilled job as inconsistent with intellectual disability for purposes of Listing 12.05C). The ALJ in this case, therefore, may have erroneously presumed that Plaintiff had performed semi-skilled work as part of an adaptive functioning analysis. The Court's ability to follow the logic the ALJ employed here is further stymied because at step four, in assessing Plaintiff's

past relevant work, the ALJ then describes this work as "unskilled work as actually performed." (*Id.* at 24.) This error, and others like them described herein, preclude the Court from following the ALJ's reasoning in her decision. *See, e.g., Cook v. Colvin*, No. 2:13-CV-20573, 2015 WL 627856, at *16 (S.D.W. Va. Feb. 9, 2015) (unpublished) ("The skill level of Claimant's prior work may also play a role in the ALJ's decision and should be clarified.").

Second, the ALJ also found that Plaintiff worked as a carpenter for six years and finds further that this requires "a level of skill and coordination that the claimant was able to achieve." (Tr. 17.) Dr. Eason, however, did not note that Plaintiff had worked as a carpenter for six years, but instead noted that Plaintiff had learned carpentry from his parents, had "worked as a carpenter" for some unknown period of time, but had not done "any [such] work for six years." (Tr. 511.) Nor is there any description in Dr. Eason's report describing what this "carpentry" work actually entailed.[10] And, beyond this, the vocational expert in this case never addressed the issue (*id.* at 54-60), and the ALJ fails to mention carpentry work in her step four analysis when she describes Plaintiff's past relevant work (*id.* at 24). Therefore, if the ALJ conducted a Prong 1 analysis here (which is unclear) she may have not only have erroneously assumed that Plaintiff performed semi-skilled labor as an electrician's helper, but she may have also erroneously assumed that Plaintiff performed years of skilled work as a

---

[10] The documentary evidence shows that Plaintiff performed custodial work, lumbering, labor for a tile company, and unskilled work as an electrician's helper. (Tr. 258, 57.) Consequently, on remand, the ALJ will have an opportunity to clarify the nature, scope, and duration of Plaintiff's "carpentry" work.

carpenter. The record here, and the ALJ's decision, are simply not clear on these points.[11]

Defendant's arguments to the contrary are not persuasive. Defendant points to a number of places in the ALJ's decision, as well as a number of places in the administrative record which the ALJ does not mention in her decision, and then contends that this demonstrates that Plaintiff had no deficits in adaptive functioning prior to age 22. (Docket Entry 13 at 9-11.) However, the Court finds these contentions unpersuasive for at least two reasons. First, Defendant's arguments, and the cases cited in support of these arguments, do not meaningfully address the type of omissions and erroneous factual findings described above. (*See id.*) Second, in light of the governing law, the Court's role here is not to make findings of fact in the first instance or to entertain *post-hoc* agency rationalizations[12] that were either not made by the ALJ, or which may have been made but which were so ambiguously articulated as to prevent meaningful review. For all these reasons, the Court concludes that

---

[11] The degree of Plaintiff's literacy is another factor that the ALJ fails to meaningfully address in her Prong 1 analysis. For example, Plaintiff testified at the hearing that he repeatedly failed his driving test and had trouble reading or writing even simple sentences. (Tr. 38-39.) *See Cook*, 2015 WL 627856, at *17. On remand, the ALJ may consider this evidence further and articulate how it impacts the 12.05C analysis.

[12] By way of example, the ALJ never discussed in her decision Plaintiff's rate of absenteeism in school. (Tr. 12-26.) However, Defendant contends "Plaintiff's school records do not establish whether his academic performance and difficulty with reading were attributed in some part to his many absences rather than an intellectual disability." (Docket Entry 13 at 10.) It is not the role of this Court to make findings of fact on this issue as it relates to Plaintiff's adaptive functioning in the first instance, or to adopt *post hoc* agency reasoning on the issue. *See Nken v. Holder*, 585 F.3d 818, 822 (4th Cir. 2009) (concluding that "a court may not guess at what an agency meant to say, but must instead restrict itself to what the agency actually did say"); *Dobbin v. Colvin*, 1:13CV558, 2016 WL 4250338, *4 (M.D.N.C. August 10, 2016) (unpublished) ("[A]ssessing the probative value of competing evidence is quintessentially the role of the fact finder and this Court is not authorized to undertake the analysis in the first instance.") (citations omitted).

14

the ALJ's prong 1 analysis is not susceptible to judicial review.

## B. The ALJ's Prong 2 Analysis Is Not Susceptible to Review.

The undersigned also concludes that the ALJ's Prong 2 analysis is not susceptible to judicial review. As to this prong—"[a] valid verbal, performance, or full scale IQ of 60 through 70"—"[a]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." *Hancock*, 667 F.3d at 474. Subparagraph 6 (relating to intelligence tests) of paragraph D (addressing acceptable documentation) of § 12.00 (covering mental disorders generally) states:

a. The results of standardized intelligence tests may provide data that help verify the presence of intellectual disability or organic mental disorder, as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.

b. Standardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A. . . .

c. Due to such factors as differing means and standard deviations, identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning. The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; e.g., the Wechsler series. IQs obtained from standardized tests that deviate from a mean of 100 and a standard deviation of 15 require conversion to a percentile rank so that we can determine the actual degree of limitation reflected by the IQ scores. In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale

15

IQs are provided in the Wechsler series, we use the lowest
of these in conjunction with 12.05.

20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.00D.6.a, 12.00D.6.b, 12.00D.6.c.

Thus, to have a valid IQ score, a standardized intelligence test must be used and the results from the standardized test should be accompanied by a narrative report which assesses the validity of the test and comments upon whether it is consistent with the developmental history and the degree of functional limitation. *Id.* A standardized intelligence test is one that is generally accepted in the medical community as a scientifically valid test in terms of reliability and accuracy, such as the Wechsler series. *Id.*

Here, on February 7, 2013, Anthony J. Smith, Ph.D. conducted a psychological evaluation of Plaintiff. (Tr. 504.) Plaintiff was cooperative with testing procedures and appeared well-motivated. (*Id.* at 505.) Plaintiff took public transportation to the appointment and arrived early. (*Id.* at 504.) Plaintiff described his physical ailments in detail and reported that he had difficulty comprehending verbal and written material. (*Id.* at 504.) He said that he was worried about financial problems, his concentration and memory were poor, and he was easily distracted. (*Id.*) Plaintiff told Dr. Smith that he was divorced, was living with his girlfriend, and could cook simple meals and do household chores. (*Id.* at 505.) Plaintiff reported that he was healthy, did not take any medication, and got along with past colleagues and supervisors at his prior work. (*Id.* at 504.)

On the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), Plaintiff's full scale IQ was 61, his performance IQ was 67, and his verbal IQ was 61, placing him in the "extremely" low range of intelligence. (*Id.* at 505.) Dr. Smith concluded that this testing

16

appeared "to be an accurate reflection of his ability." (*Id.*) On the Woodcock-Johnson III test, Plaintiff's score indicated a very low level of academic achievement. (*Id.* at 506.) Dr. Smith diagnosed Plaintiff with mood disorder due to Sotos Syndrome, with depressive features (Axis I); borderline intellectual functioning (Axis II); Sotos Syndrome 2 (Axis III); and financial complications, bereavement (Axis IV). (*Id.* at 506.)

Dr. Smith opined that Plaintiff would likely be able to interact with peers and coworkers and respond appropriately to supervision, but that he did not have the cognitive ability to manage benefits and that any benefits should be awarded to a payee on his behalf. (*Id.* at 507.) He likewise opined that Plaintiff also appeared to have several physical problems that could interfere with his daily functioning, that a physical examination should be conducted, and that if these physical complaints were verified, these issues could limit his ability to perform simple, routine, repetitive tasks and maintain concentration persistence and pace. (*Id.*)

As demonstrated in the block quote above containing the ALJ's 12.05C analysis, she made a number of findings here related to Dr. Smith. First, the ALJ found that Plaintiff does "not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function." (Tr. 16.) Second, the ALJ then described the contents of Dr. Smith's opinion along the lines set forth above. (*Id.* at 16-17.) Third, the ALJ then found that "[a]lthough Dr. Smith found that the claimant has a Full IQ score of 61, the evidence does not show that he has a physical or other mental impairment imposing an additional and significant work

related limitation of function." (*Id.* at 17.) The ALJ then cited medical evidence regarding

the purported lack of limitations as to a number of Plaintiff's severe impairments (*id.* at 17)

and, finally, concluded that "[b]ased on the above, the undersigned finds that the claimant

does not satisfy the criteria of listing 12.05. Dr. Smith's assessment was based on a one-time

visit and did not appear to consider the claimant's work history or his ability to function on a

day-to-day basis. Consequently, limited weight is given to this assessment." (*Id.*)

After careful consideration, the Court concludes that the ALJ's assessment as to Prong

2, a valid IQ score between 60 and 70, is not susceptible to judicial review. Nowhere in the

decision does the ALJ state that she finds the one IQ score on record invalid. Additionally,

even if the ALJ intended to implicitly invalidate the IQ test at issue, which is far from clear,

the reasons provided in support are insufficient. The ALJ first provides little weight to Dr.

Smith's opinion because his assessment was "based on a one-time visit." (*Id.*) It is unclear

to the undersigned why this alone would be sufficient to warrant invalidating an IQ test, which

appears to generally be administered during a single sitting. If this rationale were adopted, it

seems that it would likely invalidate most IQ tests. Consequently, clarification is in order.

Next, the ALJ supports her decision to give little weight to Dr. Smith's opinion because

he "did not appear to consider the claimant's work history or his ability to function on a day-

to-day basis." (*Id.*) However, Dr. Smith *did* consider these factors because his report

includes an entry on what constituted a "typical day"[13] for Plaintiff and an additional entry on

---

[13] Dr. Smith's entry on Plaintiff's typical day states that, "On a typical day, [Plaintiff] wakes at various times. He reports doing a few chores around his home throughout his entire day. He reports that he does not do much of anything else, but stay in his home. [Plaintiff] is able to cook simple

Plaintiff's "work history."[14]  (*Id.* at 504-05.)

Moreover, as explained, the ALJ's factual findings on Plaintiff's work history were not susceptible to judicial review.   Consequently, any implicit effort by the ALJ to invalidate Plaintiff's IQ scores on the erroneous, or potentially erroneous, assumption that Plaintiff had once performed semi-skilled work as an electrician's assistant or six years of semi-skilled or skilled work as a carpenter would not be supported by substantial evidence on this record. *See Cook*, 2015 WL 627856, at *15 ("[E]vidence relevant to the diagnostic definition, or the first prong of the listing, should generally be considered when deciding whether to reject an IQ score that falls with the second prong's requisite range of 60-70. Because the ultimate question is whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole, the propriety of [the] ALJ's decision to discredit an IQ score hinges on the specific facts presented by the record.") (citations and quotations omitted).   For all these reasons, the Court concludes that the ALJ here has failed to build a logical bridge between the evidence and her findings of fact and conclusions of law as to Prong 2 of her 12.05C analysis.

Defendant's arguments to the contrary are not persuasive.   Defendant contends that

---

meals and do household chores.   He did not report being in any social activities or organizations." (Tr. 505.)

   [14] Dr. Smith describes Plaintiff's work history as follows: "[Plaintiff] reports having worked as a carpenter assistant/labor worker for 12 years off and on.   His last day of employment was 6-7 years ago.   He reports that he was able to get along with his past colleagues and supervisors."   (Tr. 504.) The Court notes too that here Plaintiff was described as a carpenter's assistant or a labor worker, which is inconsistent with the ALJ's finding that Plaintiff worked as a carpenter.   The ALJ may consider the specifics of Plaintiff's past employment on remand.

the fact that Plaintiff was found by the ALJ to have borderline intellectual functioning amounts to substantial evidence that Plaintiff is not intellectually disabled. (Docket Entry 13 at 12-13.) However, this argument ignores the threshold issue here, which is whether the ALJ's 12.05C findings are susceptible to judicial review and, if so, whether they are supported by substantial evidence. *See Ollice v. Colvin*, No. 1:15CV927, 2016 WL 7046807, at *6 (M.D.N.C. Dec. 2, 2016) (unpublished) ("[T]he issue for disability purposes is whether a plaintiff meets the very specific criteria set out in Listing 12.05C, not whether she meets—or fails to meet—the diagnostic criteria for intellectual and adaptive impairment set out elsewhere.") *rec' adopted* Slip Op. (M.D.N.C. Jan. 10, 2017) (unpublished); *see also See Cook*, 2015 WL 627856, at *15.

## C. The ALJ's Prong 3 Analysis Is Not Supported by Substantial Evidence.

Last, the only remaining prong to consider is Prong 3. To qualify as a "significant work-related limitation" under Prong 3, the required physical or mental impairment "need not be disabling in and of itself." *Branham v. Heckler*, 775 F.2d 1271, 1273 (4th Cir. 1985). This requirement is therefore met when the ALJ has found that a claimant has other severe impairments. *Luckey*, 890 F.2d at 669; *Watson*, No. CBD-11-2491, 2013 WL 136425, at *8 (D.Md. Jan. 9, 2013) (unpublished); 20 C.F.R. pt. 404, Subpart P, App. 1, § 12.00A (describing "significantly limits" as, "i.e., is a 'severe' impairment(s)"). Here, at step two, the ALJ concluded that Plaintiff had the following severe impairments: borderline intellectual functioning, mood disorder, history of Sotos syndrome, history of renal stones, and subjective complaints of back pain with no objective findings on x-ray. (Tr. 15.) The ALJ then stated that "[t]he claimant's impairments would impose some restrictions in his ability to perform

work-related activities, but would not preclude all work and are, therefore, not disabling. (*Id.*)

Thus, if Prongs 1 and 2 are satisfied here, Plaintiff would necessarily satisfy Prong 3 of the

12.05C analysis.[15]   Consequently, the ALJ's conclusion that this prong of a 12.05C analysis

was not met is not supported by substantial evidence.[16]

## VI.  CONCLUSION

After a careful consideration of the evidence of record, the Court finds that the

Commissioner's decision is not susceptible to judicial review and therefore is not supported

by substantial evidence.  *See Cook*, 2015 WL 627856, at \*13 ("Because it is not clear to the

undersigned that the ALJ conducted a proper review at the third step of the disability

determination process, the case should be remanded for further proceedings.")   Remand is

therefore proper.   The court expresses no opinion regarding whether, at the end of the day,

Plaintiff is disabled under the Act.[17]   *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 763-764, n.3

---

[15]   Even under the most charitable reading of this prong of a 12.05C analysis, the ALJ's analysis is not susceptible to judicial review.   This is because, at best, the findings in the ALJ's decision are self-contradictory, at one point declaring that there are multiple severe impairments imposing workplace restrictions (Tr. 15), and then later attempting to explain why these limitations do not impose workplace restrictions (*id.* at 16-17).   Such findings are not susceptible to judicial review.

[16]   Defendant all but concedes this point by failing to address it other than to observe in a footnote that the error is harmless because Prongs 1 and 2 cannot be met and because a claimant must satisfy all three prongs of a 12.05C analysis in order to meet the listing.   (Docket Entry 13 at 13, n.5.) However, as explained above, the ALJ's analysis of Prongs 1 and 2 here are not susceptible to judicial review and so a remand for additional proceedings is in order.

[17]   Plaintiff would have the Court declare that all three prongs of the 12.05C analysis are met and immediately award benefits.   (Docket Entry 11 at 20.)   However, because a number of factual issues remain to be considered and resolved, the Court concludes that remand is proper here.   *See Radford v. Colvin*, 734 F.3d 288, 294-95 (4th Cir. 2013) ("Although we hold that the district court did not apply the wrong legal standard, we nonetheless vacate its judgment because it chose the wrong remedy:   Rather than 'reversing' the ALJ and remanding with instructions to award benefits to Radford, the district court should have vacated and remanded with instructions for the ALJ to clarify

(W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted de novo).

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be **REVERSED**, and that the matter be **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for further administrative action as set out above. To this extent, Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 10) should be **GRANTED** and Defendant's Motion for Judgment on the Pleadings (Docket Entry 12) be **DENIED.**

_____
Joe L. Webster
**United States Magistrate Judge**

February 16, 2018

---

why Radford did not satisfy Listing 1.04A.").